******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# SRDJAN MILENKOVIC *v.* MARIAH S. MILENKOVIC
## (AC 47631)

Cradle, C. J., and Suarez and Bishop, Js.

*Syllabus*

The plaintiff appealed and the defendant cross appealed from the trial court's judgment dissolving the parties' marriage and granting the plaintiff's motion for contempt. The plaintiff claimed, inter alia, that the court erred in issuing its custody orders. The defendant claimed that the court incorrectly held her in contempt for violating an earlier parenting order regarding the plaintiff's overnight visitation with the parties' son. *Held*:

The plaintiff's claims that the trial court's orders regarding parenting of the parties' two minor children, child support, alimony, and asset and debt allocation were in error were unavailing, as the court's analysis of those issues was comprehensive and correct.

The trial court erred in finding the defendant in contempt, as the order at issue was ambiguous.

Argued February 19—officially released July 21, 2026

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Heller, J.*, issued certain orders; thereafter, the case was tried to the court, *Vizcarrondo, J.*; judgment dissolving the marriage and issuing certain orders and granting the plaintiff's motion for contempt, from which the plaintiff appealed and the defendant cross appealed to this court. *Reversed in part*; *award vacated*.

*Srdjan Milenkovic*, self-represented, the appellant-cross appellee (plaintiff).

*Igor Kuperman*, for the appellee-cross appellant (defendant).

*Opinion*

BISHOP, J. In this marital dissolution action, the self-represented plaintiff husband, Srdjan Milenkovic, appeals and the defendant wife, Mariah S. Milenkovic,

cross appeals.[1] In his appeal, the plaintiff attacks the trial court's orders regarding parenting of the parties' two minor children, child support, alimony, and asset and debt allocation. He asserts that, due to the defendant's alleged misconduct, he should have been awarded full custody of the parties' children; that the court miscalculated the parties' incomes; that, because the court's pendente lite child support order provided for equal physical custody, he should not have been ordered to pay retroactive child support for that time period; that the marital debt should have been allocated based on a calculation of the parties' incomes; that the court should have ordered that he be reimbursed for certain expenses regarding the parties' marital residence; and that he should have received an equitable share of the defendant's pension. In her cross appeal, the defendant claims that the court incorrectly held her in contempt for violating an earlier parenting order. We disagree with the plaintiff's claims on appeal, and we agree with the defendant's claim on her cross appeal. Accordingly, we affirm the judgment in part and reverse it in part.

I

We begin with the plaintiff's appeal. At the outset, we note with concern that, instead of simply focusing on the issues he has raised on appeal, the plaintiff, a practicing attorney, repeatedly has attacked the trial judge personally in the briefs he filed with this court.[2] In its memorandum of decision, the court stated that "the plaintiff's poor treatment of the defendant and

---

[1]We note that, although the plaintiff is self-represented in this Connecticut action, he is a member of the New York bar and is a practicing attorney.

[2]For example, in the beginning paragraph of his principal appellate brief, after stating that "[i]t is impossible to overstate the rampage that the defendant . . . has perpetrated on the court below," the plaintiff asserts that, "[u]nfortunately, erstwhile Family Court Judge Joseph Vizcarrondo gave her free reign to run roughshod . . . ." Similarly, in his reply brief, when arguing that the court miscalculated the parties' incomes, the plaintiff states that the court "cherry picked [and reverse] engineered [its] calculation of the plaintiff's income" and posits that, "because of Judge Vizcarrondo's personal dislike of the plaintiff,

his infidelity [were] the overwhelming causes of the breakdown of the marriage." Additionally, the court commented on the plaintiff's demeanor during the trial and noted that his "behavior requires substantive consideration." The court found that the plaintiff's "lack of courtroom decorum" and "churlish behavior" was "principally intended to harass, annoy and intimidate." And, in this regard, the court correlated the plaintiff's courtroom behavior throughout the multiday trial to the defendant's claims regarding the plaintiff's behavior during the marriage, finding that the plaintiff "exhibited cruel, controlling, hectoring and domineering behavior toward the defendant . . . ." To this end, we note that, despite asserting that his "alleged breach of decorum is not reflected in the trial transcripts," the plaintiff nonetheless defends his "outward displays of emotion [as] justified . . . ." Contrary to the plaintiff's claims; see footnote 2 of this opinion; we do not interpret the court's comments and conclusions regarding the plaintiff's conceded behaviors to evince the court's personal dislike of the plaintiff. Instead, we conclude, on the basis

he found the plaintiff to have greater income than the defendant." (Emphasis omitted.)

Parties to an appeal may reasonably claim that a trial judge has made legal errors or that the court abused its discretion in formulating its orders, but no litigant is entitled to personally attack a judge. For most, this should be a matter of common sense; for members of the bar, it is a condition of ethical advocacy. We therefore cannot countenance the personal attacks against the trial judge that are contained in the briefs filed with this court by the plaintiff, who is a practicing attorney and a member of the New York bar. See, e.g., *Notopoulos* v. *Statewide Grievance Committee*, 277 Conn. 218, 231–32, 890 A.2d 509 ("Whether an attorney represents himself or not, his basic obligation to the court as an attorney remains the same. He is an officer of the court . . . . An attorney must conduct himself . . . in a manner that comports with the proper functioning of the judicial system." (Internal quotation marks omitted.)), cert. denied, 549 U.S. 823, 127 S. Ct. 157, 166 L. Ed. 2d 39 (2006); see also *Emerick* v. *Glastonbury*, 177 Conn. App. 701, 739, 173 A.3d 28 (2017) ("[A]dverse rulings do not themselves constitute evidence of bias. . . . Obviously, if a ruling against a party could be used as an indicia of bias, at least half of the time, every court would be guilty of being biased against one of two parties." (Internal quotation marks omitted.)), cert. denied, 327 Conn. 994, 175 A.3d 1245 (2018).

of this record, that the court's observations were evidence based and relevant to the issues presented to the court.

Aside from the plaintiff's vituperative accusations directed at the trial court; see footnote 2 of this opinion; the balance of his brief is no more than a rehash of the arguments he made during the trial regarding the parenting, cash flow, and asset and debt distribution issues. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case." **(**Internal quotation marks omitted.**)** *Misthopoulos* v. *Misthopoulos*, 297 Conn. 358, 366, 999 A.2d 721 (2010). Contrary to the plaintiff's claims, we conclude that the court's memorandum of decision broadly reflects the court's understanding of the underlying facts and the court's proper exercise of discretion on all of the disputed claims set forth by the plaintiff.

As to the parenting issues, the court adopted the recommendation of the court-appointed guardian ad litem **(GAL)**, Attorney Jacquelyn A. Conlon, that, in broad strokes, proposed that the parties share joint legal custody of the children, with their primary residence being with the defendant. The recommendation also suggested that each parent have substantial access to both children but yielded to the defendant the authority to make final decisions regarding the children's health and educational needs. Additionally, in the court's memorandum of decision, the court properly referred to the appropriate statutory requirements and decisional law bearing on all the financial issues before it. On the basis of our thorough review of the record and the issues presented on appeal, we conclude that the court's comprehensive and correct

analysis of the issues requires no further reiteration or review by this court.

## II

We turn next to the defendant's cross appeal and the court's finding that the defendant was in contempt of court regarding previous orders concerning parenting time issued by the court, *Heller, J.*, on January 12, 2022. By way of background, the September 23, 2021 marital dissolution complaint alleged that the parties have two children: a daughter born in December of 2017 and a son born in May of 2020. Once the parties separated attendant to the onset of this marital dissolution action, the children lived primarily with the defendant and the parties had an agreed access schedule that allowed for the plaintiff to have substantial access to the children but did not include any overnight parenting time for the plaintiff with the younger child. The record reflects that, notwithstanding this arrangement, the parties made frequent accusations against the other regarding their respective care of the children throughout the pendency of this case.

The record further reflects that, following an emergency filing by the defendant, the parties reached a parenting agreement on November 8, 2021, that stated in part that the plaintiff agreed to hire a babysitter to supervise all of his parenting time for a period of two months, and that, once a babysitter was in place, the parties would effectuate a "3-2-2-3" shared parenting plan for their older child. The plaintiff agreed, as well, "not to effectuate overnight parenting time with their younger child . . . for the time being." The parties' agreement also provided for the appointment of a GAL as soon as possible. In this part of the agreement, the parties contemplated that the GAL to be appointed would make certain recommendations regarding unsupervised parenting time for the plaintiff and overnights with the parties' younger child. Finally, the parties agreed to

communicate through the website known as Our Family Wizard.[3]

The record reflects, as well, that, as this matter progressed, the plaintiff's lack of overnight access to their younger child was an ongoing issue between the parties because the defendant was nursing him and sought to continue to do so until he was two and one-half years old, which is what she had done with the parties' older child. The defendant maintained that allowing overnight visitation with the plaintiff would interfere with her ability to nurse the parties' younger child.

On January 12, 2022, Judge Heller approved the appointment of Conlon as the GAL for the children.[4] The court also made the following order: "The parties' agreement [of November 8, 2021] is restored with a couple of changes. The full two month period for hiring a babysitter is starting effective today. The parties are going back to the visitation schedule that they had for [their daughter]. They are to work immediately with Attorney Conlon in working out a parenting plan for [the plaintiff] to have overnight parenting time with [their son].

"[The parties' son] is twenty months old, I believe. If there needs to be some adjustment so that he's on a bottle, rather than simply nursing, that's an adjustment the parties will have to make. . . . So, the first order of

---

[3]"Our Family Wizard is a website offering web and mobile solutions for divorced or separated parents to communicate, reduce conflict, and reach resolutions on everyday coparenting matters . . . ." (Internal quotation marks omitted.) *State* v. *Kenneth K.*, 232 Conn. App. 657, 675 n.10, 337 A.3d 1139 (2025). This court is aware that Our Family Wizard often is recommended by counsel as a vehicle to prevent acrimonious personal exchanges between the parties. Our review of the messages exchanged between the parties and admitted into evidence reveals that it was of minimal help in enabling effective communication between the parties in this action.

[4]In doing so, the court advised the parties that "I think you have chosen an excellent guardian ad litem. I think Attorney Conlon is very practical, very thoughtful, very experienced. And I think she will be tremendous help to the parties." The court formally ordered Conlon's appointment thereafter, on January 24, 2022.

business is going to be a parenting plan for [the parties' son]. The existing parenting plan is restored with respect to [their daughter]."

Thereafter, on May 12, 2022, the plaintiff filed a motion for contempt in which he alleged that, in the four months that had passed since Judge Heller's January order, the plaintiff had not had any overnight visits with the parties' son. He further alleged that "[t]he defendant still refuses to cooperate with establishing an overnight visitation schedule for the plaintiff and [the parties' son]. As such, there is no overnight parenting plan in place for father and son."

Notably, after the plaintiff filed his motion for contempt, another hearing took place before Judge Heller on August 22, 2022. While the primary focus of this proceeding concerned the children's respective school attendance, the fact that overnight visitation for the plaintiff with the parties' son had not yet begun was brought to the court's attention, initially by Conlon and then by the plaintiff's counsel.[5] Specifically, Conlon stated that "there needs to be a change in the parenting plan. . . . And [the parties' son] needs to start doing overnights with his father. . . . He's in the process of being weaned, and he's . . . twenty-seven months. . . . [The defendant] is in the process of weaning him. . . . [The plaintiff] will need to get a bed for [their son] at his place. . . . Both of their apartments are lovely, lots of toys. . . . But that needs to start." The court, *Heller, J.*, agreed with Conlon.

Shortly thereafter, the plaintiff's counsel advised the court that "[t]his issue of overnights is also another critical issue for [the plaintiff]. . . . I don't know if Your Honor recalls. . . . Back in January . . . Your Honor had entered orders pursuant to . . . an ex parte motion that the parties . . . were to immediately work with a GAL . . . to work out . . . an overnight parenting schedule . . . for [the parties' son] and his father. Well, we're now at the

---

[5]The plaintiff was represented by counsel at the hearings before Judge Heller on January 12 and August 22, 2022.

end of August . . . and that has not occurred." He further posited that "[the plaintiff is losing out on . . . the opportunity to develop a normal . . . familial relationship with [his son]" and that "it's quite concerning that we're now . . . almost at the end of the year, and overnights still have not started."[6]

The defendant's counsel then explained to the court that "[the defendant] has done her best to abide by the spirit of the court's instructions. . . . She's weaning the youngest child off. We're still waiting for the GAL to speak with the pediatrician to see if it makes sense to do so now." After the court remarked that "it would surprise me if the pediatrician said it's not a good idea for the child to be weaned at the age of twenty-seven months," Conlon explained that, although she had not yet been able to speak with the pediatrician, "the doctor's notes said . . . that it would be nice if [the parties' son] . . . could nurse as long as [their daughter] did, which was two and [one-half] years. . . . So, it's two years and three months. . . . And it's something that we've been working on since I've been involved in the case." She also stated that she had seen the plaintiff with his son the week prior and "[t]hey have an absolutely normal father-son relationship. He adores his father. . . . There's no problem with the attachment or the bond between the two of them. So, it's not as dire as that. But overnights should happen."

After hearing from the parties' counsel and the GAL, the court responded: "The child needs a bed. Get a bed for him. And as far as weaning, it should happen. Or if you choose not to wean him, get him used to taking a bottle. You know, there are certainly also doctors that say a two and one-half year old shouldn't have a bottle anymore. So, you need to deal with all of that. But it's also . . . in the mix of the parties are getting divorced. So, in terms of . . . the doctor's views as to what would

---

[6]At no time, however, did the plaintiff's counsel reference the plaintiff's motion for contempt, which was pending at that time.

be recommended, what would be best, you also need to be practical about it.”

It is particularly notable that, during this second hearing, Judge Heller did not opine that the defendant had wilfully disobeyed her January order. Instead, a fair reading of the transcript of that proceeding reflects Conlon's understanding that the defendant found support from their child's pediatrician in her desire to continue nursing the parties' son and that Conlon was continuing to work with the parties to effectuate overnight visitation for the plaintiff with him, as Judge Heller had ordered in January. In short, this issue appeared to still be pending several months after the court's January order, and the court itself acknowledged that fact.[7] Nevertheless, the trial court, *Vizcarrondo, J.*, granted the plaintiff's motion for contempt of Judge Heller's January 2022 order in conjunction with the multiday trial on the marital dissolution. In finding the defendant in contempt in its May 7, 2024 memorandum of decision, the court opined: “The credible evidence is that months passed but the defendant refused to cooperate in reaching a parenting plan that provided the plaintiff with overnight visits for [the parties' son]. According to the plaintiff, the delay in implementing overnights hindered [their son's] development and undercut the child's paternal bond with him. The court finds by clear and convincing evidence that the defendant did not make reasonable, good faith efforts to establish an appropriate parenting plan as contemplated in the manner contemplated by Judge Heller. To be clear, the contumacious conduct is not the failure to reach accord, rather, the lack of good faith in discussing the matter. Although the defendant alleged that her conduct was not wilful and was necessary because she was nursing [the parties' son], that claim was previously rejected. Indeed, in January 2022, Judge Heller ruled conclusively that [the child's] nursing was not a valid ground to withhold overnight visitation, noting that [the parties' son] could and should transition

[7]The transcript from the August 22, 2022 hearing was admitted into evidence at the dissolution trial before Judge Vizcarrondo.

to a bottle. Regardless of whether the defendant agreed, Judge Heller's view of the matter was clear and unambiguous, as was her order that the defendant cooperate concerning a revised parenting plan. Notwithstanding those orders, the defendant failed to provide overnight visitation through September 2022. Her conduct was wilful, and the defendant is adjudicated in contempt." As punishment, the court made an award of counsel fees in the amount of $2500. The defendant appeals from that contempt order, claiming that Judge Heller's January 2022 order was not, as Judge Vizcarrondo determined, clear and unambiguous. We agree.

"It is the burden of the party seeking an order of contempt to prove, by clear and convincing evidence, both a clear and unambiguous directive to the alleged contemnor and the alleged contemnor's wilful noncompliance with that directive. . . . The question of whether the underlying order is clear and unambiguous is a legal inquiry subject to de novo review. . . . We review the trial court's determination that the violation was wilful under the abuse of discretion standard." (Citations omitted; internal quotation marks omitted.) *Birkhold* v. *Birkhold*, 343 Conn. 786, 811, 276 A.3d 414 (2022).

In the matter at hand, we do not interpret Judge Heller's order that the parties "are to work immediately with Attorney Conlon *in working out* a parenting plan for [the plaintiff] to have overnight parenting time with [their son]" as commanding specific, definite behavior by the defendant, the alleged contemnor. (Emphasis added.) Notably, the order did not require the defendant to provide the plaintiff with immediate overnight access to the parties' son. Indeed, the order contained no specific timeline for overnights to commence. Rather, the court merely ordered that *both parties* cooperate with the GAL to "[work] out" and establish a schedule that would include overnight visitation.

The difficulty of enforcing a general order to cooperate is underscored by Conlon's trial testimony. In response to questioning by the plaintiff, Conlon stated that "*Judge*

*Heller's order was that we were supposed to work towards overnights with [your son].* When I had finally gotten [the defendant] to agree to certain overnights, you decided you were going to keep [your son] for more time. So that upset [the defendant], and you wouldn't give [your son] back." (Emphasis added.) When asked by the plaintiff whether this behavior upset her, Conlon responded: "I wasn't upset. . . . [T]hey're not my children. They're my wards. I'm upset that you . . . seem to think that they're pawns, but no. *I was upset because we were trying to negotiate it and hopefully make everything move more smoothly so we wouldn't have to be here today. But that stopped.*" (Emphasis added.) Shortly thereafter, when asked directly by the plaintiff whether the defendant had decided not to follow the court order regarding overnight visitation, the following colloquy between the plaintiff and Conlon ensued:

"[Conlon]: It's not that she . . . [decided not] to follow the court order. She had concerns as a mother that she wouldn't agree to stop breastfeeding [your son].

"[The Plaintiff]: Despite the court order, correct?

"[Conlon]: Well, I don't know that this is a court order that says she has to stop breastfeeding him."

"Civil contempt is committed when a person violates an order of court which requires that person in specific and definite language to do or refrain from doing an act or series of acts. . . . Whether an order is sufficiently clear and unambiguous is a necessary prerequisite for a finding of contempt because [t]he contempt remedy is particularly harsh . . . and may be founded solely upon some clear and express direction of the court. . . . One cannot be placed in contempt for failure to read the court's mind. . . . It is also logically sound that a person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation

of whether a party is in compliance with the order." (Internal quotation marks omitted.) *Chang* v. *Chang*, 197 Conn. App. 733, 737, 232 A.3d 1186 (2020).

After carefully reviewing the record and interpreting Judge Heller's January 2022 order, we conclude that it was not sufficiently clear and decisive to so as to subject the defendant to the contempt power of the court for not cooperating with the GAL to develop a plan for the plaintiff's overnight visitation with the parties' son. See, e.g., *Glory Chapel International Cathedral* v. *Philadelphia Indemnity Ins. Co.*, 224 Conn. App. 501, 512, 313 A.3d 1273 (2024) (this court exercises plenary review in interpreting trial court orders). Rather, we conclude that the order is ambiguous. As noted previously in this opinion, the order did not set any time frames for action, nor did it explain what "working out a parenting plan" with the GAL entailed, let alone indicate what steps would be considered sufficient for purposes of compliance with the order. See, e.g., *Chang* v. *Chang*, supra, 197 Conn. App. 743 (concluding that language "work with the [GAL]" was susceptible to multiple reasonable interpretations and was thus ambiguous (internal quotation marks omitted)). Indeed, at the time of the trial in this matter, the defendant and Conlon were still working on a plan, and Conlon herself expressly rejected the notion that the defendant was not cooperating with her efforts. We therefore conclude that the court erred in finding the defendant in contempt.

The judgment is reversed only as to the finding of contempt and the award of attorney's fees in connection with that finding is vacated; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.